UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

LISA E.,[1]

                        Plaintiff,

        v.

COMMISSIONER OF SOCIAL SECURITY,

                        Defendant.

_____

<u>DECISION & ORDER</u>

20-CV-0037MWP

## <u>PRELIMINARY STATEMENT</u>

Plaintiff Lisa E. ("plaintiff") brings this action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying her application for Supplemental Security Income ("SSI").  Pursuant to the Standing Order of the United States District Court for the Western District of New York regarding Social Security cases dated June 29, 2018, this case has been reassigned to, and the parties have consented to the disposition of this case by, the undersigned.  (Docket # 15).

Currently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  (Docket ## 9, 13).  For the reasons set forth below, I hereby vacate the decision of the Commissioner and remand this claim for further administrative proceedings consistent with this decision.

---

[1]  Pursuant to the November 18, 2020 Standing Order of the United States District Court for the Western District of New York regarding identification of non-governmental parties in social security opinions, the plaintiff in this matter will be identified and referenced solely by first name and last initial.

## DISCUSSION

### I.     Standard of Review

This Court's scope of review is limited to whether the Commissioner's determination is supported by substantial evidence in the record and whether the Commissioner applied the correct legal standards.  *See Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004) ("[i]n reviewing a final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision"), *reh'g granted in part and denied in part*, 416 F.3d 101 (2d Cir. 2005); *see also Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) ("it is not our function to determine *de novo* whether plaintiff is disabled[;] . . . [r]ather, we must determine whether the Commissioner's conclusions are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard") (internal citation and quotation omitted).  Pursuant to 42 U.S.C. § 405(g), a district court reviewing the Commissioner's determination to deny disability benefits is directed to accept the Commissioner's findings of fact unless they are not supported by "substantial evidence."  *See* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive").  Substantial evidence is defined as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation omitted).

To determine whether substantial evidence exists in the record, the court must consider the record as a whole, examining the evidence submitted by both sides, "because an analysis of the substantiality of the evidence must also include that which detracts from its weight."  *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988).  To the extent

they are supported by substantial evidence, the Commissioner's findings of fact must be sustained "even where substantial evidence may support the claimant's position and despite the fact that the [c]ourt, had it heard the evidence *de novo*, might have found otherwise." *Matejka v. Barnhart*, 386 F. Supp. 2d 198, 204 (W.D.N.Y. 2005) (citing *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983)).

A person is disabled for the purposes of SSI and disability benefits if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) & 1382c(a)(3)(A). In assessing whether a claimant is disabled, the ALJ must employ a five-step sequential analysis. *See Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (*per curiam*). The five steps are:

(1)     whether the claimant is currently engaged in substantial gainful activity;

(2)     if not, whether the claimant has any "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities";

(3)     if so, whether any of the claimant's severe impairments meets or equals one of the impairments listed in Appendix 1 of Subpart P of Part 404 of the relevant regulations (the "Listings");

(4)     if not, whether despite the claimant's severe impairments, the claimant retains the residual functional capacity [("RFC")] to perform [his or her] past work; and

(5)     if not, whether the claimant retains the [RFC] to perform any other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520(a)(4)(i)-(v) & 416.920(a)(4)(i)-(v); *Berry v. Schweiker*, 675 F.2d at 467.

"The claimant bears the burden of proving his or her case at steps one through four[;] . . . [a]t

step five the burden shifts to the Commissioner to 'show there is other gainful work in the

national economy [which] the claimant could perform.'" *Butts v. Barnhart*, 388 F.3d at 383

(quoting *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998)).


## II.   The ALJ's Decision

In her decision, the ALJ followed the required five-step analysis for evaluating

disability claims.  Under step one of the process, the ALJ found that plaintiff had not engaged in

substantial gainful activity since August 6, 2018, the application date.  (Tr. 18).[2]  At step two, the

ALJ concluded that plaintiff had the following severe impairments: disorders of the back and

neck, fibromyalgia, carpal tunnel syndrome, anxiety, and depression.  (*Id.*).  The ALJ also noted

that plaintiff suffered from several other impairments but that those impairments were

"non-severe."  (Tr. 19; *see also* Tr. 18 ("[i]n reviewing the medical evidence of record, [the ALJ]

also finds that any other impairment other than those [found to be severe at step two] present[]

no residual signs or symptoms expected to cause more than minimal work-related

limitation[s]")).  At step three, the ALJ found that plaintiff did not have an impairment (or

combination of impairments) that met or medically equaled one of the listed impairments in the

Listings.  (Tr. 19).

The ALJ concluded that plaintiff retained the RFC to perform light work but with

certain limitations.  (Tr. 21).  Specifically, the ALJ found that plaintiff could only occasionally

stoop, crouch, kneel, or climb ramps or stairs, could never use ladders, ropes, or scaffolds, must

---

[2]   The administrative transcript (Docket # 6) shall be referred to as "Tr. ___," and references thereto utilize the internal Bates-stamped pagination assigned by the parties.

4

avoid concentrated exposure to fumes, odors, dusts, gases, and other pulmonary irritants, was limited to simple, routine, and repetitive tasks, and was limited to simple decisions when dealing with change in the work setting. (*Id.*). At step four, the ALJ found that plaintiff had no past relevant work. (Tr. 27). At step five, the ALJ determined that other jobs existed in significant numbers in the national economy that, based on her age, education, work experience, and RFC, plaintiff could perform, such as shipping and receiving weigher, work ticket distributor, and label coder. (Tr. 27-28). Accordingly, the ALJ found that plaintiff was not disabled. (Tr. 28).

## III.    Plaintiff's Contentions

Plaintiff contends that the ALJ's determination that she was not disabled is not supported by substantial evidence and is the product of legal error. (Docket ## 9, 14). First, plaintiff argues that certain portions of the ALJ's physical RFC determination conflict with the opinion of consultative examiner Russell Lee, MD, and that the ALJ failed to adequately explain why she did not adopt the entirety of that opinion despite finding it to be persuasive. (Docket ## 9-1 at 16-19; 14 at 1-2). Second, plaintiff maintains that the ALJ erroneously evaluated the opinions of her treating primary care providers, Sarah Gallagher-Bartholomew ("Gallagher-Bartholomew"), PA-C,[3] and Anthony Bartholomew ("Dr. Bartholomew"), MD. (Docket ## 9-1 at 19-28; 14 at 3).

---

[3] Throughout the record, this provider is referenced variously as "Sarah Bartholomew, PA-C" and as "Sarah Gallagher, PA-C." (*See, e.g.*, Tr. 436, 475, 1001, 1163). Moreover, of the two opinions completed by this source at issue, one is signed by "Sarah Gallagher, PA-C" and the other by "Sarah Bartholomew, PA-C." (*See* Tr. 1074, 1080). While plaintiff refers to this provider as "PA-C Gallagher" (*see* Docket # 9-1 at 5, 19-28), and the Commissioner refers to her as "Ms. Bartholomew" (*see* Docket # 13-1 at 13), there is no dispute that she is the same person. Like the ALJ, I will refer to her as "Sarah Gallagher-Bartholomew, PA-C." (Tr. 26).

IV.    **Analysis**

I turn first to plaintiff's contention that the ALJ erroneously considered the opinions of her treating primary care providers, Dr. Bartholomew and Gallagher-Bartholomew. (Docket ## 9-1 at 19-28; 14 at 3).  Plaintiff generally asserts that the reasons provided by the ALJ in finding these opinions to be unpersuasive were "insufficient and could not have justified the ALJ's rejection of the[se] opinion[s]," particularly considering plaintiff's fibromyalgia diagnosis.  (Docket # 9-1 at 22).  The Commissioner responds that the ALJ's consideration of these opinions complied with the new regulations pertaining to the evaluation of medical opinion evidence.  (*See* Docket # 13-1 at 13-15).

As both parties recognize, the Commissioner has implemented new regulations relating to the evaluation of medical opinion evidence for claims filed on or after March 27, 2017, which apply here.[4]  *See generally* 20 C.F.R. §§ 404.1520c, 416.920c.  Under these new regulations, the ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)[,] . . . including those from [a claimant's] medical sources." *Id.* at §§ 404.1520c(a), 416.920c(a); *accord Harry B. v. Comm'r of Soc. Sec.*, 2021 WL 1198283, *6 (N.D.N.Y. 2021) ("[a]ccording to the new regulations, the Commissioner will no longer give any specific evidentiary weight to medical opinions; this includes giving controlling weight to any medical opinion") (quotations omitted); *Rivera v. Comm'r of Soc. Sec. Admin.*, 2020 WL 8167136, *14 (S.D.N.Y. 2020) ("the new regulations eliminate the perceived hierarchy of medical sources, deference to specific medical opinions, and assigning 'weight' to a medical opinion") (citation omitted), *report and recommendation adopted by*, 2021 WL 134945 (S.D.N.Y. 2021).  "Instead, an ALJ is now obligated to evaluate the persuasiveness of 'all of the

---

[4]  Plaintiff filed her claim for SSI on August 6, 2018.  (*See* Tr. 16, 153).

medical opinions' based on the same general criteria: (1) supportability; (2) consistency with other evidence; (3) the source's relationship with the claimant; (4) the source's area of specialization; and (5) other relevant case-specific factors 'that tend to support or contradict a medical opinion or prior administrative medical finding.'" *Amanda R. v. Comm'r of Soc. Sec.*, 2021 WL 3629161, *6 (N.D.N.Y. 2021) (footnote omitted) (quoting 20 C.F.R. §§ 404.1520c(c)(1)-(5), 416.920c(c)(1)-(5)).

According to the regulations, "supportability" and "consistency" are the "most important" factors in evaluating the persuasiveness of medical opinion evidence.  20 C.F.R. §§ 404.1520c(a), (b)(2), 416.920c(a), (b)(2).  Indeed, "[a]n ALJ is specifically required to 'explain how [he or she] considered the supportability and consistency factors' for a medical opinion," *Harry B. v. Comm'r of Soc. Sec.*, 2021 WL 1198283 at *7 (quoting 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2)), and need not discuss the remaining factors, *see Rivera v. Comm'r of Soc. Sec. Admin.*, 2020 WL 8167136 at *14.  As it relates to the "supportability" factor, the regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s)[,] . . . the more persuasive the medical opinion(s) . . . will be."  20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1).  With regard to the "consistency" factor, the regulations state that "[t]he more consistent a medical opinion(s) . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) . . . will be."  *Id.* at §§ 404.1520c(c)(2), 416.920c(c)(2).  "If the ALJ fails adequately to explain the supportability and consistency factors, or bases [his or] her explanation upon a misreading of the record, remand is required."  *Rivera*, 2020 WL 8167136 at *14 (quotations omitted).

7

Here, Gallagher-Bartholomew and Dr. Bartholomew, who began treating plaintiff as far back as January 2016 (*see* Tr. 848, 1040), co-signed two forms relating to plaintiff's RFC, the first on September 20, 2018, and the second on July 11, 2019.  (*See* Tr. 1069-74, 1075-80).[5] In the first, Gallagher-Bartholomew and Dr. Bartholomew indicated that they typically saw plaintiff every three to six months, but sometimes as frequently as every one to two months. (Tr. 1069).  They diagnosed plaintiff with multiple impairments, including fibromyalgia, cervical spine stenosis, carpal tunnel syndrome bilaterally, major depressive disorder, recurrent, severe, generalized anxiety disorder, Raynaud's syndrome, obstructive sleep apnea, migraines, COPD, peripheral artery disease, osteopenia, overactive bladder, and chronic sinusitis.  (Tr. 301, 1069). Gallagher-Bartholomew and Dr. Bartholomew noted that plaintiff had tried multiple medications for fibromyalgia, but was unable to tolerate the medications, and that she was not currently on medications for her depression/anxiety because she had difficulty tolerating them, although she did go to counseling for her mental impairments.  (Tr. 1070).  They also indicated that plaintiff had been seen at DENT for chronic neck issues and was a candidate for surgery, but providers there "recommended trying pain management first," and that plaintiff had undergone carpal tunnel surgery on the left side.  (Tr. 302).  Gallagher-Bartholomew and Dr. Bartholomew had not seen improvement in plaintiff's chronic pain or mental status over the past three years. (Tr. 1070).

---

[5] As the ALJ noted, these two opinions appear several times throughout the record.  (*See* Tr. 26 (citing Tr. 301-304 (September 20, 2018 opinion), 1069-1074 (September 20, 2018 opinion), 1075-1080 (July 11, 2019 opinion), 1166-71 (July 11, 2019 opinion))).  The July 11, 2019 opinion cited at these two parts of the record is the same.  There are differences, however, in the two September 20, 2018 opinions.  For instance, the version cited at Tr. 301-304 appears to be missing the fourth and fifth pages of the opinion, and it also contains additional information about plaintiff's diagnoses and treatment history that the version at Tr. 1069-74 does not contain. Neither party explains this inconsistency.  For purposes of this decision, I will cite the version of the September 20, 2018 opinion appearing at Tr. 1069-74 because it is more complete, but I have also considered the additional information contained in the version at Tr. 301-304.

In terms of plaintiff's functional capacity, based on plaintiff's "state[ment] [that her] legs ache within 5-10 min[utes] of standing," Gallagher-Bartholomew and Dr. Bartholomew indicated that plaintiff's impairments prevented her from standing for six to eight hours. (*Id.*). Similarly, based on plaintiff's "reports [that she experiences] neck [and] back pain within 5-10 min[utes] [of sitting] [and] has to change position[s]," they indicated that plaintiff's impairments prevented her from sitting upright for six to eight hours. (*Id.*). On the form, they indicated that plaintiff could not stand and/or sit upright for six to eight hours because she "has to change positions frequently due to neck, back, [and] leg pain" and had to lie down during the day because she "lays down every [one to two hours] due to her neck, arm, back, [and] leg pain." (Tr. 1071). Moreover, Gallagher-Bartholomew and Dr. Bartholomew opined that plaintiff could walk only one to two yards without stopping, could lift and carry only five to ten pounds daily during an eight-hour workday, had difficulty bending, squatting, kneeling, and turning certain body parts, and could only "[r]arely" – defined as 0-30% of the time – reach up above her shoulders, reach down to waist level, reach down towards the floor, carefully handle objects, and handle with her fingers. (Tr. 1071-72). Gallagher-Bartholomew and Dr. Bartholomew stated that plaintiff's pain was "[c]hronic with acute exacerbations" and occurred daily at a reported level of 6/10 to 9/10. (Tr. 1072).

In addition, Gallagher-Bartholomew and Dr. Bartholomew noted that plaintiff's depression/anxiety was a "big factor in her inability to work" and that she "does not like being around people, gets anxious/panic attacks, [and has] trouble concentrating [and] completing tasks." (*Id.*). They found plaintiff's claims of pain to be "[c]redible"; based on their treatment of plaintiff, they opined that her "mental [and] physical conditions prevent[ed] her from currently holding a job as her depression/anxiety/pain are uncontrolled." (Tr. 1073). At the time they

completed the form, Gallagher-Bartholomew and Dr. Bartholomew stated that they "d[id] not expect [plaintiff] to return to work."  (*Id.*).

Their second RFC form, completed on July 11, 2019, was very similar to the one described above.  Their opinion that plaintiff could not work due to her uncontrolled mental and physical impairments, including depression, anxiety, and pain (adding that plaintiff experienced "daily fatigue"), remained the same, as did their view of the extent of plaintiff's functional capabilities.  (*See* Tr. 1076-79).  Significantly, Gallagher-Bartholomew and Dr. Bartholomew opined that, of all plaintiff's impairments, "fibromyalgia [and] mental health [were] the main issues."  (Tr. 1075).  At the time of their second opinion, plaintiff was taking mental health medication, but she continued to have problems.  (Tr. 1076).  Nearly one year after their first opinion, Gallagher-Bartholomew and Dr. Bartholomew continued to observe "not . . . much improvement" in plaintiff's chronic pain and mental health.  (*Id.*).

The ALJ considered these opinions and found them to be "not persuasive." (Tr. 26).  In doing so, she characterized the opinions as assessing limitations relating to plaintiff's "severe anxiety and depression, along with multiple physical conditions."  (*Id.*).  As to supportability, the ALJ noted that the opined limitations "appear[ed] to be based on [plaintiff's] subjective complaints at the time," indicating that the forms referenced what plaintiff "state[d]" or "report[ed]," which, in the ALJ's view, "significantly reduc[ed] the probative value of the form as an objective opinion statement."  (*Id.*).  The ALJ also stated that Gallagher-Bartholomew's and Dr. Bartholomew's functional assessments were "unsupported by [plaintiff's] often noted normal physical examination findings during treatment with these providers, such as [plaintiff's] lack of distress, observed comfort, lack of extremity deficits, and normal strength."  (*Id.*).  Regarding consistency, the ALJ found that the opined limitations were

"inconsistent with the overall record, including [plaintiff's] conservative treatment history, [her] ability to perform cooking, cleaning, driving, shopping, and daily childcare, and the opinion of Dr. Poss."  (*Id.*).  As far as plaintiff's mental health impairments, the ALJ noted that the "notations of severe anxiety and depression and difficulty getting along with others and concentrating [were] also unsupported by and inconsistent with the overall record, including [plaintiff's] conservative treatment history, generally only mild or moderate deficits observed at mental health treatment visits, often noted normal speech, eye contact, and appearance, and ability to cook, clean, shop, perform childcare, and socialize with others."  (Tr. 26-27).

Among other things, plaintiff contends that it was error for the ALJ to find that these opinions were not well-supported because they were based upon plaintiff's subjective complaints and conflicted with the generally unremarkable physical findings noted throughout the record, considering her diagnosis of fibromyalgia.  (*See* Docket # 9-1 at 22-23).  Plaintiff also asserts that the ALJ mischaracterized her daily activities and effectively drew an unfair inference from her treatment regimen, rendering her inconsistency findings unsupported by substantial evidence.  (*See id.* at 24-26).

The Commissioner's new regulations do not alter the ALJ's obligation to "provide sufficient reasoning for th[e] [c]ourt to engage in meaningful appellate review," *Shirley C. v. Comm'r, Soc. Sec. Admin.*, 2021 WL 3008265, *8 (D. Or. 2021), and to reach an RFC determination "base[d] . . . [up]on all the evidence available in the record," *Velasquez v. Kijakazi*, 2021 WL 4392986, *26 (S.D.N.Y. 2021) (citation and quotations omitted), and based upon substantial evidence, *see Amber H. v. Saul*, 2021 WL 2076219, *9 (N.D.N.Y. 2021) ("[o]n remand, the ALJ should specifically explain how he considered the supportability and consistency factors as to each medical opinion per [20 C.F.R.] § 416.920c(b)(2), taking care to

support his evaluation with substantial evidence reflected in the longitudinal record"). Moreover, in adjudicating cases subject to the new regulations, courts have continued to apply certain "longstanding general principles of judicial review," *Velasquez v. Kijakazi*, 2021 WL 4392986 at *20 n.25, including that the ALJ cannot "ignore or mischaracterize evidence" in the record, *Cuevas v. Comm'r of Soc. Sec.*, 2021 WL 363682, *15 (S.D.N.Y. 2021) ("[w]hile an ALJ is entitled to reconcile conflicting evidence in the record, and need not address every last piece of medical evidence, the ALJ must provide a reviewing [c]ourt with a sufficient explanation to ensure that they have complied with the legal procedures controlling their decision and cannot ignore or mischaracterize evidence[;] . . . [t]hese principles apply equally to the ALJ's mandatory explanation of the new consistency factor"). *See also Rivera*, 2020 WL 8167136 at *14 ("[i]f the ALJ fails adequately to explain the supportability and consistency factors, *or bases [his or] her explanation upon a misreading of the record*, remand is required") (emphasis supplied) (quotations omitted).

With these principles in mind and based on my review of the record and the ALJ's decision, I find that the ALJ's analysis was flawed by several mischaracterizations of the record, as well as a fundamental failure to understand the nature of plaintiff's fibromyalgia diagnosis. Review of the decision demonstrates that these errors influenced the ALJ's evaluation of the opinion evidence, defeating this Court's ability to conclude that the ALJ's decision was supported by substantial evidence.

There is no dispute that plaintiff alleged that fibromyalgia was one of the impairments that limited her ability to work or that she was diagnosed with this impairment by a rheumatologist in June 2016. (*See* Tr. 278, 1047-50). The ALJ acknowledged as much in her decision; at step two, the ALJ found that fibromyalgia was among plaintiff's severe impairments,

and, in her RFC analysis, the ALJ stated that she "considered any added or accumulated effects [plaintiff's] fibromyalgia has had on her ability to function," in accordance with Social Security Ruling ("SSR") 12-2p, 2012 WL 3104869 (S.S.A. 2012).  (Tr. 18, 23).  Little else about the ALJ's decision, however, demonstrates that she fully "[]understood the . . . nature of [fibromyalgia]."  *Ian S. v. Comm'r of Soc. Sec.*, 2021 WL 3292203, *3 (W.D.N.Y. 2021) ("[a]lthough the ALJ referred to SSR 12-2p at step three of the sequential analysis, . . . (which specifically provides guidance on evaluating fibromyalgia in disability claims), and considered [p]laintiff's fibromyalgia as a severe impairment, it appears that she misunderstood the very nature of that condition").

As an initial matter, it is not clear from the ALJ's decision that she appreciated that the limitations assessed by plaintiff's primary care providers were largely attributable to plaintiff's fibromyalgia diagnosis.  By July 2019, Gallagher-Bartholomew and Dr. Bartholomew opined that plaintiff's fibromyalgia was her "main" physical impairment, emphasizing plaintiff's complaints of pain throughout her body.  (Tr. 1075).  Throughout the course of her years-long treatment with Gallagher-Bartholomew and Dr. Bartholomew, plaintiff repeatedly complained of body-wide pain, fatigue, and headaches (all symptoms associated with fibromyalgia, as described in more detail below), and Gallagher-Bartholomew often noted plaintiff's fibromyalgia diagnosis.  (*See*, *e.g.*, Tr. 734, 693, 743, 724, 810, 807, 845, 999).  Thus, reasonably construed, Gallagher-Bartholomew's and Dr. Bartholomew's opined functional limitations – many of which would preclude plaintiff's ability to perform light work[6] – appear to be related to plaintiff's fibromyalgia.

---

[6]  Light work requires approximately six hours of standing and/or walking and up to two hours of sitting during an eight-hour workday.  *See* 20 C.F.R. § 416.967(b); *Mancuso v. Astrue*, 361 F. App'x 176, 178 (2d Cir. 2010) (summary order) ("[l]ight work requires the ability to lift up to 20 pounds occasionally, lift 10 pounds frequently, stand and walk for up to 6 hours a day, and sit for up to two hours").  Gallagher-Bartholomew and Dr.

The ALJ's assessment of their opined functional limitations, however, suggests that she failed to appreciate the association between the limitations and plaintiff's fibromyalgia diagnosis. Indeed, in finding that the limitations were "unsupported" by Gallagher-Bartholomew's and Dr. Bartholomew's treatment notes, the ALJ observed that their opinions focused on plaintiff's "severe anxiety and depression" and "multiple physical conditions" (Tr. 26), without acknowledging Gallagher-Bartholomew's and Dr. Bartholomew's opinion that fibromyalgia was one of plaintiff's two "main" health impairments. (Tr. 1075).

Moreover, the reasons provided by the ALJ to support her conclusion that the opinions were not well-supported – that they appeared to be based upon plaintiff's subjective complaints and that the limitations assessed were not congruent with largely normal physical findings – are contrary to well-established principles governing analysis of disability determinations in cases involving fibromyalgia. For example, as the Second Circuit has recognized, fibromyalgia is a "disease that eludes [objective] measurement." *Green-Younger v. Barnhart*, 335 F.3d 99, 108 (2d Cir. 2003). "Persons afflicted with fibromyalgia may experience severe and unremitting musculoskeletal pain, accompanied by stiffness and fatigue due to sleep disturbances, yet have *normal physical examinations*, *e.g.*, full range of motion, no joint swelling, normal muscle strength and *normal neurological reactions*[;] [t]hus, lack of positive, objective clinical findings does not rule out the presence of fibromyalgia, but may, instead, serve to *confirm* its diagnosis." *Campbell v. Colvin*, 2015 WL 73763, *5 (N.D.N.Y. 2015) (emphasis in original) (footnote omitted); *accord Davis v. Berryhill*, 2018 WL 4629126, *4 (W.D.N.Y. 2018) (noting the common symptoms associated with fibromyalgia, including "body-wide pain

---

Bartholomew explicitly opined that plaintiff could not stand for six hours, could not walk more than two yards without stopping, and could not lift and carry more than ten pounds. (*See* Tr. 1076-77). These restrictions would prevent plaintiff from engaging in the full range of light work.

and tender points in joints, muscles, tendons, and other soft tissues," as well as "fatigue, sleep problems, headaches, depression, anxiety, and other symptoms") (citation omitted). Accordingly, while the "mere diagnosis of fibromyalgia without a finding as to the severity of symptoms and limitations does not mandate a finding of disability," *Rivers v. Astrue*, 280 F. App'x 20, 22 (2d Cir. 2008) (summary order), "denying a fibromyalgia-claimant's claim of disability based in part on a perceived lack of objective evidence is reversible error," *Campbell v. Colvin*, 2015 WL 73763 at *6.

Despite the well-settled understanding that fibromyalgia impairments may not manifest in abnormal objective findings, when evaluating the evidence of record, the ALJ repeatedly referenced the lack of abnormal findings during plaintiff's physical examinations. For instance, she emphasized that Gallagher-Bartholomew and Dr. Bartholomew "often noted normal physical examination findings [of plaintiff] during treatment." (Tr. 26; *see also* Tr. 23 (finding that despite consistent complaints of "fatigue, headaches, and pain[,] . . . examination of [plaintiff] has often been generally unremarkable, as [plaintiff] has been observed to be in no distress with full range of motion in the neck and extremities, 5/5 strength, a normal gait, and only sporadic tenderness") (citing, *inter alia*, Tr. 532, 521, 495, 1000)). She further concluded that plaintiff's "generally normal physical examination findings" supported her conclusion that plaintiff was capable of the physical demands of light work. (Tr. 24). When evaluating the credibility of plaintiff's allegations that she was limited in her ability "to sit, stand, or walk for long periods," the ALJ again noted a lack of physical findings, such as muscle atrophy or wasting. (Tr. 25). Finally, when evaluating the supportability of the limitations assessed by Gallagher-Bartholomew and Dr. Bartholomew, the ALJ found them to be "unsupported by [plaintiff's] often noted normal physical examination findings during treatment." (Tr. 26). On

15

this record, I find that the ALJ unduly emphasized the absence of abnormal results during

plaintiff's physical examinations – without a demonstrated understanding of the nature of

fibromyalgia – particularly in finding that Gallagher-Bartholomew's and Dr. Bartholomew's

opined limitations were unsupported by their own treatment notes.  *See*, *e.g.*, *Ian S. v. Comm'r of*

*Soc. Sec.*, 2021 WL 3292203 at *3 (treatment notes highlighting plaintiff's "good strength and

coordination, good muscle tone, intact sensation, and full range of motion with some pain" did

"not undercut the diagnosis of fibromyalgia or [p]laintiff's complaints of symptoms[;] . . .

[w]hen determining an RFC based on fibromyalgia, the ALJ is not entitled to rely solely on

objective evidence – or lack thereof – related to fibromyalgia, but must consider all relevant

evidence, including the longitudinal treatment record[;] denying a fibromyalgia-claimant's claim

of disability simply because such evidence is not corroborated by objective medical evidence is

reversible error") (citation omitted); *Christine S. v. Comm'r of Soc. Sec.*, 2020 WL 3642244, *6

(N.D.N.Y. 2020) (holding the ALJ erred by placing emphasis on results of physical

examinations; "[i]n stark contrast to the unremitting pain of which fibrositis patients complain,

physical examinations will usually yield normal results – a full range of motion, no joint

swelling, as well as normal muscle strength and neurological reactions[;] . . . the absence of

swelling joints or other orthopedic and neurologic deficits is no more indicative that the patient's

fibromyalgia is not disabling than the absence of a headache is an indication that a patient's

prostate cancer is not advanced") (quoting *Green-Younger v. Barnhart*, 335 F.3d at 108-109);

*Poudrier v. Berryhill*, 2020 WL 1080446, *2 (D. Conn. 2020) ("[t]he ALJ . . . misapplied the

relevant law in assessing [physician's] opinions regarding the severity and effects of [plaintiff's]

fibromyalgia . . . [by] emphasiz[ing] the fact that [plaintiff] had 'no abnormal musculoskeletal

findings and no neurological deficits' and 'generally normal' physical examinations to support

his finding of residual functional capacity"); *Ortiz v. Colvin*, 2014 WL 819960, *13 (D. Conn.

2014) (concluding the ALJ appeared to have "misunderstood the nature of fibromyalgia" by

highlighting the lack of abnormalities during physical examinations when evaluating opinion

evidence and plaintiff's subjective complaints).

        Moreover, in assessing the supportability of the opinions, the ALJ concluded that

Gallagher-Bartholomew and Dr. Bartholomew placed undue reliance on plaintiff's subjective

reports of pain and limitations.  (Tr. 26).  Yet, a physician's measurements of limitations due to

fibromyalgia are necessarily based, at least in part, on a claimant's subjective reporting of pain.

*See Greene v. Berryhill*, 2018 WL 8646666, *7 (D. Conn. 2018); *Mnich v. Colvin*, 2015 WL

7769236, *18 (N.D.N.Y.) ("the fact that [the physician] may have relied on plaintiff's subjective

complaints in reaching her opinion as to plaintiff's limitations hardly undermines his opinion as

to her functional limitations as a patient's reports of complaints, or history, is an essential

diagnostic tool") (internal quotations and brackets omitted), *report and recommendation adopted

by*, 2015 WL 7776924 (N.D.N.Y. 2015); *Campbell*, 2015 WL 73763 at *11 ("reliance on

subjective complaints in fibromyalgia cases hardly undermines medical opinion as to functional

limitations it produces").  For this reason, assessment of a claimant's subjective statements

"takes on increased importance in the context of fibromyalgia cases," and, when discounting or

rejecting a claimant's subjective complaints, the ALJ "must do so explicitly and with sufficient

specificity to enable the [c]ourt to decide whether there are legitimate reasons for the ALJ's

disbelief and whether the determination is supported by substantial evidence."  *McKillip v.

Comm'r of Soc. Sec.*, 2019 WL 5677595, *7 (W.D.N.Y. 2019) (internal quotations and brackets

omitted); *Davis v. Berryhill*, 2018 WL 4629126 at *5 ("when fibromyalgia is alleged, the

credibility of a claimant's testimony regarding her symptoms must take on substantially

increased significance in the ALJ's evaluation of the evidence") (brackets and citation omitted).

Of course, a fibromyalgia diagnosis "does not mean that [p]laintiff's subjective statements are

simply assumed to be credible." *McKillip v. Comm'r of Soc. Sec.*, 2019 WL 5677595 at *7.

Here, the ALJ's failure to acknowledge the importance of plaintiff's subjective complaints, and

her determination to discount plaintiff's treatment providers' opinions because they appeared to

be based upon them, suggests that the ALJ failed to appreciate the unique circumstances

presented by plaintiff's impairment.

    The ALJ's fundamental misunderstanding of the nature of fibromyalgia appears to

have permeated her consistency analysis as well.  The ALJ described plaintiff's treatment history

as "routine and conservative" and found Gallagher-Bartholomew's and Dr. Bartholomew's

opinions to be "inconsistent with the overall record, including [plaintiff's] conservative treatment

history."  (Tr. 25-26).  The ALJ highlighted the fact that since the alleged onset date, plaintiff

had "largely sought only primary care treatment for her conditions[,] . . . compared to prior

periods when she sought specialized rheumatology treatment."  (Tr. 25; *see also* Tr. 23 (citing

Tr. 1047-55 (Fall 2016 treatment notes from Buffalo Rheumatology and Medicine PLLC))).

What the ALJ failed to acknowledge, however, is that there "is no radical treatment for

fibromyalgia."  *Hyer v. Colvin*, 2013 WL 1193444, *7-8 (N.D.N.Y.) ("the ALJ's decision,

particularly regarding the conservative level of treatment prescribed, fails to recognize the

elusive nature of fibromyalgia"), *report and recommendation adopted by*, 2013 WL 1193431

(N.D.N.Y. 2013).  Indeed, the ALJ does not identify any evidence demonstrating that plaintiff

was advised to pursue a particular course of treatment for her fibromyalgia, yet failed to do so.[7]

---

[7] The ALJ points out that plaintiff "stated that she did not want physical therapy or a surgical referral for her neck pain."  (Tr. 23 (citing Tr. 497 (May 10, 2018 treatment note completed by Gallagher-Bartholomew))).  Yet the treatment note cited by the ALJ clearly references physical therapy or surgery in the context of plaintiff's spinal

Rather, the record demonstrates that plaintiff was unable to tolerate the medications typically prescribed to manage fibromyalgia symptoms, and her providers' notes suggest that they had no other treatment options to offer plaintiff.  (*See*, *e.g.*, Tr. 813 (July 5, 2017 treatment note completed by Gallagher-Bartholomew; "[plaintiff] continues to [complain of] body wide pain and fatigue[;] [s]he has been diagnosed with fibromyalgia but unable to tolerate any medications so I am unsure what else to do fo[r] []her[;] [plaintiff] saw rheumatology and tried the medications they recommended, too")).  Accordingly, the ALJ's reliance on plaintiff's purported "conservative" treatment further evidences the ALJ's fundamental misunderstanding of fibromyalgia.  *See Williams v. Saul*, 2021 WL 1222770, *15 (E.D. Mo. 2021) ("[t]he ALJ discounts [the physician's] opinion because she found [p]laintiff's treatment records show a conservative course of treatment[;] [t]here is no evidence in the record to suggest, however, that [p]laintiff's treatment was conservative or that she did not pursue a valid course of treatment for her fibromyalgia").

       Equally troubling is the ALJ's mischaracterization of plaintiff's daily activities in finding Gallagher-Bartholomew's and Dr. Bartholomew's opined limitations to be inconsistent with the record.  (Tr. 26 (finding that Gallagher-Bartholomew's and Dr. Bartholomew's opinions were "also inconsistent with the overall record, including . . . [plaintiff's] ability to perform cooking, cleaning, driving, shopping, and daily childcare")).  In evaluating plaintiff's activities of daily living, the ALJ determined that "[plaintiff's] described daily activities are not as limited to the extent one would expect, given the complaints of disabling symptoms and limitations." (Tr. 25).  She found that "[a]lthough [plaintiff] has reported that her husband performs most daily chores and home activities, the record does not support this assertion."  (*Id.*).  As support

_____

stenosis in her cervical spine, not her diagnosed fibromyalgia.  (*See* Tr. 497).  In fact, that same treatment note states that plaintiff had taken medication for her fibromyalgia, but did "not tolerate[] any medicines [she] tried."  (*Id.*).

for this finding, the ALJ pointed to plaintiff's consultative examinations for the proposition that plaintiff "reported the ability to perform personal care, cook, clean, do laundry, shop, manage funds, drive, socialize with family and friends, and perform daily childcare." (*Id.* (citing Tr. 582, 666)). Not only does the ALJ's statement exaggerate what plaintiff reported to the consultative examiners that she was capable of doing on a daily basis, but it does not acknowledge that the record demonstrates that plaintiff consistently reported that she had difficulty performing the majority of these activities due to complaints of pain.

Specifically, in her Adult Function Report, plaintiff alleged fairly restricted activities of daily living, much of which was the result of pain. (*See* Tr. 288-95). She noted that she laid down and sat a lot of the day, but had to switch positions before "long" because of pain; could dress and bathe herself, but that both caused pain, and that sometimes she needed help washing herself due to pain; could prepare easy meals, but was generally limited in her meal preparation because she could not stand for long; only shopped with help once per month due to pain; and experienced pain lifting over five pounds, standing, walking, sitting, climbing stairs, kneeling, reaching, and using her hands. (Tr. 288-94). She also indicated throughout the report that she received substantial help from her husband. For instance, while plaintiff helped care for her six-year-old daughter, her husband bathed, dressed, and took care of the daughter "most of [the] time" (Tr. 289), and he also helped cook and complete household chores and yard work, which plaintiff could not perform due to pain (Tr. 290-91).

These daily activities are generally consistent with plaintiff's testimony before the ALJ at the administrative hearing. Plaintiff testified that her husband (who himself received disability benefits due to schizophrenia and bipolar disorders) babysat plaintiff's grandchildren because she could not "do [any]thing" (Tr. 44), as well as took care of plaintiff's daughter for

most of the day, except in the morning when plaintiff did her daughter's hair (Tr. 45).  Plaintiff

told the ALJ that she helped to fold laundry while sitting and could prepare simple meals, but

that her husband "pretty much d[id] everything" else around the house.  (*Id.*).  Plaintiff also

testified that she experienced good days and bad days but that her "bad days outweigh[ed] [her]

good days," and estimated that she had as many as four to six bad days per week; only on her

good days could plaintiff tend to her personal care, help her husband fold the laundry, or

complete meal preparation.  (Tr. 62-63).  She testified that she went grocery shopping once a

month with a friend, who assisted her to place the groceries in her vehicle, but needed to lie

down "all day [for days after shopping] because [she was] exhausted and [in] pain."  (Tr. 46).

Plaintiff stated that she could not stand on her feet for much longer than ten or fifteen minutes

before needing to lie down because of pain (Tr. 55) and indicated that she had to lie down every

day for a couple of hours due to fatigue (Tr. 71).

        These reported limitations are not as inconsistent with the consultative examiners'

notations as the ALJ represents.  Specifically, plaintiff told Dr. Lee on October 2, 2018 that she

was responsible for caring for her six-year-old daughter daily, but that she only engaged in

simple food preparation about twice a week, light cleaning twice a week, helped with laundry

(which involved mostly folding clothes) once a week, shopped with assistance about once a

month, showered about once a week, dressed herself about three times a week, and enjoyed

watching television and listening to the radio.  (Tr. 582).  On October 26, 2018, plaintiff reported

to consultative psychologist Christine Ransom, PhD, that she could dress, bathe, and groom

herself, do light cooking, cleaning, laundry, and shopping, but that she did get help from her

husband.  (Tr. 666).  Plaintiff also told Dr. Ransom that she could manage money, had a driver's

license, socialized with her family and friends, and was "usually able to take care of her

daughter, but if she [was] having additional pain her husband help[ed]." (*Id.*). Plaintiff emphasized that she "tend[ed] to rest a lot." (*Id.*). Based on this evidence, the ALJ's suggestion that plaintiff ever reported[8] that she could perform a broad range of daily activities unencumbered by pain or without the assistance of others mischaracterizes the record.

A comprehensive review of the ALJ's decision suggests a fundamental misunderstanding of the nature of fibromyalgia – an impairment that plaintiff's treating providers concluded was a primary cause of her limitations. This misunderstanding unquestionably influenced the ALJ's assessment of both the supportability and consistency of medical opinion evidence from Gallagher-Bartholomew and Dr. Bartholomew. The ALJ's analysis of the opinions was further undermined by her overstatement of plaintiff's activities of daily living. Accordingly, I am unable to conclude that the ALJ's evaluation of the opinions submitted by Gallagher-Bartholomew and Dr. Bartholomew was supported by substantial evidence. *See Kristi M. v. Comm'r Soc. Sec. Admin.*, 2021 WL 4429795, *9 (D. Or. 2021) (ALJ's inconsistency conclusion not supported by substantial evidence where ALJ's decision demonstrated a fundamental failure to appreciate the "hallmark" of plaintiff's chronic fatigue syndrome, including that it "often manifests with normal objective findings"); *Ian S.*, 2021 WL 3292203 at *8 (remanding where ALJ's evaluation of opinion from treating physician improperly relied upon a lack of objective findings and a mischaracterization of plaintiff's activities of daily living); *Christine P. v. Saul*, 2021 WL 1854508, *9 (N.D.N.Y. 2021) (remanding where ALJ's reasons for discounting treating physician opinion failed to properly

---

[8] The ALJ also relied on two notations in plaintiff's psychiatric treatment notes from April and May 2019 that stated that plaintiff was "able to complete all activities of daily living, manage funds, drive, and access public transportation." (Tr. 25 (citing Tr. 1082, 1086)). These conclusory statements shed no light on the full extent of plaintiff's daily activities, nor do they reflect whether plaintiff experienced physical pain while completing activities of daily living.

account for the particular characteristics of plaintiff's diagnosis of complex regional pain syndrome); *see also Ortiz v. Colvin*, 2014 WL 819960 at *13 (remanding for reevaluation of opinion evidence where ALJ decision demonstrated that "the ALJ, like the SSA consulting physicians, misunderstood the nature of fibromyalgia") (quotations omitted).  Remand is thus warranted on this basis.

Moreover, review of the ALJ's decision, particularly her repeated reliance on the absence of abnormal physical examination findings and mischaracterizations of plaintiff's activities of daily living throughout the sequential evaluation, suggests that these errors likely affected the ALJ's evaluation of the other medical opinions of record, as well as her evaluation of plaintiff's subjective complaints.  Accordingly, on remand, the ALJ should reconsider these evaluations and "properly analyze [p]laintiff's subjective complaints and activities of daily living, as well as the medical evidence, in light of [her] fibromyalgia and with the understanding that fibromyalgia often does not result in objective findings or diagnostic tests."  *See Ian S.*, 2021 WL 3292203 at *8.  In light of this determination, I decline to address plaintiff's remaining contentions.

## <u>CONCLUSION</u>

For the reasons stated above, the Commissioner's motion for judgment on the pleadings **(Docket # 13)** is **DENIED**, and plaintiff's motion for judgment on the pleadings **(Docket # 9)** is **GRANTED** to the extent that the Commissioner's decision is reversed, and this

case is remanded to the Commissioner pursuant to 42 U.S.C. § 405(g), sentence four, for further

administrative proceedings consistent with this decision.

**IT IS SO ORDERED.**


                                           *s/Marian W. Payson*
                                         MARIAN W. PAYSON
                                 United States Magistrate Judge

Dated:  Rochester, New York
        September 30, 2021